UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT PTAK,<br>RENEE FRISCH,<br>            -and-<br>MICHAEL KANE,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>JEFFREY ALLEN,<br>RILEY GEARE,<br>CARLOS ROLLON,<br>ALISA SANTORO,<br>JANIS SHEN<br><br>  -and-<br><br>HOWARD SADOWSKY<br><br>                              Defendants | Docket No.<br><br>AMENDED COMPLAINT<br>08-cv-00147 |

Plaintiffs Robert Ptak, Renee Frisch and Michael Kane, complaining of Defendants Jeffrey Allen, Riley Geare, Carlos Rollon, Alisa Santoro, Janis Shen and Howard Sadowsky submit the following Complaint to the Court:

THE PARTIES

1. Plaintiff Robert Ptak ("Ptak") is a natural person residing in the State of New York who at all pertinent times was a performing musician, and also carried on the business of managing groups of performing musicians. During 2006 and until the third week of July 2007, Ptak supported and managed a band consisting of the Defendants.

2. Plaintiff Renee Frisch ("Frisch") is a natural person residing in the State of New York who was, from December, 2000 to the end of March 2007, a television producer at MTV Networks, and who became associated with Ptak in managing musical groups, including the group consisting of the Defendants.

3. Plaintiff Michael Kane ("Kane") is a natural person residing in the State of New York engaged in the business of graphic design who performed significant graphic design services for the Defendants in conjunction with their management by Ptak, payment for which services

p. 2

were promised by Defendants, with such payments guaranteed by Ptak.

4.  Defendant Jeffrey Allen ("Allen") is a natural person who at all pertinent times has attempted to perform as an instrumental musician and in a style commonly known as 'rock' in conjunction with the other Defendants.  Allen resides in the State of California.

5.  Defendant Riley Geare ("Riley") is a natural person who at all pertinent times has attempted to perform as an instrumental musician in a style commonly known as 'rock' in conjunction with the other Defendants.  Riley resides in the State of California.

6.  Defendant Carlos Rollon ("Rollon") is a natural person who at all pertinent times has attempted to perform as an instrumental musician in a style commonly known as 'rock' in conjunction with the other Defendants.  Rollon resides in the State of California.

7.  Defendant Alisa Santoro ("Santoro") is a natural person who at all pertinent times has attempted to perform as an instrumental musician and vocalist in a style commonly known as 'rock' in conjunction with the other Defendants.  Santoro resides in the State of California.  On information and belief, Defendant Santoro is married to Defendant Rollon.

8.  Defendant Janis Shen ("Shen") is a natural person who at all pertinent times has been a practicing attorney admitted to the bar of the State of New York.  Shen resides in  the State of New York.

9.  Defendant Howard Sadowsky ("Sadowsky") is a natural person who at all pertinent times has been a practicing attorney admitted to the bar of the State of New York. Sadowsky resides in  the State of New York.

10.  Defendants Allen, Riley, Rollon and Santoro are referred to below as the "Defendant Musicians."  Shen and Sadowsky are referred to below as the "Defendant Attorneys."

11.  The Defendant Musicians have performed together for several years and continued to perform as a group up to the contractual breach described below, under the leadership of Darren Geare ("Geare"), a prior Defendant to the instant action.  Geare has settled with Plaintiffs but has not and is not fully conforming to the terms of his settlement agreement with

p. 3

Plaintiffs.    From early 2006 up to the contractual breach described below, the Defendant Musicians along with Geare, the band leader, worked under the management, direction, and support— emotional, artistic and financial— of Ptak.   As Ptak's activities in managing the Defendant Musicians' group increased, Ptak acquired the organizational assistance of Frisch and, in the area of graphic design, of Kane.

12.   During all pertinent times, the aforementioned group has been known by the name, "Hong Kong Six" (the "Band"); and, during all pertinent times, Geare was the leader and primary composer of music and lyrics for the Band.

13.   The Band had no significant reputation or success, and was not a profitable enterprise until it acquired financial investment and tutelage from Ptak and soon afterward from Frisch (the "Co-Managers").   During that earlier period, the Defendant Musicians supported themselves principally by means of menial jobs outside the music profession.

14.   From the time the Co-Managers began to manage the Band, they paid all professional expenses and a considerable proportion of the living expenses of its members (the "Band Members").   The Co-Managers' investments in the band included, but were not limited to (1) a considerable sum toward the Band Members' living expenses including food, gasoline and rent; (2) air travel including trips to New York, Los Angeles and Austin, Texas, to negotiate agreements, to make recordings, to send support and supervisory personnel, and to market the Band to music industry executives; (3) retaining an experienced music industry executive to serve as a consultant to help market the Band to major record labels, and (4) buying or lending musical equipment and renting time in recording studios.   One extremely significant contribution of Plaintiffs toward the Defendant musicians was (5) the engagement of the Defendant Attorneys to design and draft the contractual basis of an "artist centered" label.   In this regard, the Defendant Attorneys were hired to represent both the Co-Managers and the Defendant Musicians on a neutral basis in intra-company negotiations, but in regard to the outside world, to represent the interest of the company overall on a partisan basis.

p. 4

## JURISDICTION AND VENUE

15.  The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, 1332, and 1338, and has supplemental jurisdiction over the Plaintiffs' pendant State claims pursuant to 28 U.S.C. § 1367.

16.  Venue in the Southern District of New York is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1400(a) as the most significant events and the copyrighted works-for-hire discussed below are located in the State of New York, and the Defendants can be found in the State of New York for purposes of 28 U.S.C. § 1400.

## SUMMARY OF THE CAUSES OF ACTION

17.  Ptak and Geare resumed their former acquaintanceship late in 2005 when Geare managed to reestablish contact with Ptak over the Internet through the MySpace networking site. Both Ptak and Geare were musicians adept in the style of popular music generally known as 'rock', but Ptak was more experienced and had achieved considerable commercial success.  In contrast, at the commencement of their work together, Geare and the other Band Members needed and had always needed to work at menial jobs in order to support their activities in the music industry.

18.  Geare informed Ptak that he had organized the Band and sent Ptak a copy of a crudely-produced demonstration compact disc (the "Geare CD").  Although the Geare CD was far below the production quality demanded by any major record label in the contemporary music industry, it contained songs which Ptak perceived as demonstrating talent, particularly talent in creative music composition.

19.  Possessing considerable experience in developing bands as a musician/ producer, Ptak became interested in guiding Hong Kong Six to achieve what he perceived as its potential, if managed expertly, to become a commercially successful group.  Using his network of contacts, Ptak was immediately able to interest Kevin Hershey ("Hershey") a prominent industry executive in the Band's potential at, on information and belief, the world's largest music publish-

p. 5

ing company.  Hershey asked Ptak whether the Band had current management.  Ptak did not know the answer to Hershey's question, and therefore telephoned Geare to refer the question to Geare. Geare, in response, as leader of the Band, suggested to Ptak that Ptak should become the Band's exclusive manager.  After days of serious deliberation, Ptak orally expressed his willingness to serve as manager; soon afterwards, purchased a ticket to fly Geare to New York to enable both parties (Ptak and Geare) to negotiate further details of, and execute, a management agreement

20.   Just prior to Geare's arrival in New York, Hershey asked Ptak whether he (Ptak) had any legal representation.  Ptak responded that he knew several good entertainment attorneys.  Hershey, while acknowledging that Ptak might know some good attorneys, personally recommended his own friend Sadowsky.  Ptak, impressed by Hershey's recommendation, quickly set up a meeting with Sadowsky.

21.   At the meeting, Ptak explained to Sadowsky that during his past career as a successful rock musician, he had experienced problems with attorneys; and, that he was specifically not looking for an attorney to manipulate management against the musicians clients or, conversely, the musician clients against management.  Ptak explained that his plan was to establish an "artist centered" label and he therefore needed an attorney who could represent both the Co-Managers and the Defendant Musicians on a neutral basis in intra-company negotiations, but represent the interest of the company overall on a partisan basis in regard to business negotiations with the outside world (the "Collaborative Attorney Role").  Sadowsky responded that he agreed with Ptak's vision and would be very pleased to represent Ptak and help him build his management company by acting according to the Collaborative Attorney Role.

22.  Ptak and Sadowsky also orally agreed on a compensation scheme for Sadowsky ("the Percentage Compensation Scheme") pending Geare's approval.  Under the Percentage Compensation Scheme, Sadowsky was to represent Ptak's incipient company in all negotiations with the outside world including but not limited to representing Ptak's musicians clients and, as compensation, would receive five (5) percent of any income to be derived from any deal in which

p. 6

he would participate as an attorney negotiator.

  23. During the course of Ptak's initial discussions with Sadowsky and during the further course of Ptak's more than two (2) year collaboration with Sadowsky ("the Ptak-Sadowsky Collaboration"), Sadowsky was well aware that Ptak considered Sadowsky to be his attorney for all entertainment industry and entertainment industry related matters. Yet Sadowsky, despite Ptak's sporadic prodding, failed to draft any contracts designed to defend Ptak's rights to musical material that Ptak was investing in heavily. Furthermore, Sadowsky never suggested to Ptak that he or Ptak should develop any written agreement to defend Ptak's rights as a client of Sadowsky. Ptak was, furthermore, never shown a statement of client rights as is mandated by New York State law.

  24. Upon Geare's arrival in New York, Ptak introduced Geare to Sadowsky. Geare was favorably impressed with Ptak's abilities, contacts, commitment and interest in developing the Band and also with Sadowsky's ability to play the Collaborative Attorney Role. Geare therefore readily agreed that Ptak would become the Band's exclusive manager under the terms of a standard industry management agreement (the "Management Agreement") and to the Sadowsky Percentage Compensation Scheme.

  25. The Management Agreement provided for a manager's commission of twenty (20) percent on any gross income that the Band or any of the Band Members might derive from the music industry (the "Management Commission"). If the Band might terminate Ptak as manager (the "Termination"), the Management Agreement provided for a smaller commission (the "Termination Commission") on any income flowing from (1) any material written, recorded or performed, and/or (2) any contracts negotiated or formed in the period (the "Band Performance Period") running from the formation of the Management Agreement to the Termination. This commission was to run for a period of years to be determined by industry standards. The other Defendants eagerly agreed with the terms of the Management Agreement, and, on information and belief, memorialized their allegiance to its terms, on many occasions, via a succession of e-mails.

p. 7

26. Ptak arranged for Frisch to join in the management of the Band which eagerly accepted her as its Co-Manager and agreed to pay her, a half portion of the total compensation initially promised to Ptak. The Co-Managers also arranged for Kane to perform graphic design services for the Band. The Band utilized the services of Kane with the understanding that payment for his services would be deferred up to the point in which the Band would begin to earn money from the music industry.

27. The Band also benefited from the continuing payment of their expenses, professional and personal, and accepted such payments as loans (cumulatively, the "Continuing Loan") which constituted a financial obligation on the part of the Band Members toward the Co-Managers. In addition to their commitment to pay the Management Commission to the Co-Managers, the Band Members additionally committed themselves to repay the Continuing Loan with any income to be derived from the music industry.

28. The Band Performance Period ran from at least April 2006, until the third week of July 2007. During this period the Co-Managers performed all management services for the Band with Kane fulfilling most graphic design requirements.

29. While Geare was still in New York, the Co-Managers commenced their promotional activities for the Band, including attempting to interest industry executives in charge of artists and repertoire ("A&R") in the Band and introducing Geare to a proficient audio engineer and producer Alessandro Elena (a/k/a Alex) ("Elena"). Elena was also managed by the Co-Managers.

30. Elena immediately began to make completely new recordings of Geare in his studio in New York, and later in 2006, moved to Los Angeles to set up his own recording studio (the "Los Angeles Studio"). Elena's move was largely financed by the Co-Managers in the expectation that it would facilitate the production of future recordings ("the Funded Sound Recordings") to be performed by the Band, with the Co-Managers providing the funding and serving as executive producers, and with Elena serving as a local supervisor, audio engineer and producer.

p. 8

31.  During the Band Performance Period and with the Co-Managers' financing, Elena supervised the recording of a professional-quality demonstration compact disc to showcase the Band's abilities (the "HK6 Demo"); it was packaged in a black cover with the Band's distinctive logo selected from a plethora of designs created by Kane.  The Co-Managers then utilized this HK6 Demo to attempt to persuade (1) major and independent record companies ("Major Labels" and "Independent Labels"), or (2) publishing companies, to sign either a recording, distribution or publishing contract with the Band.

32.  With the production of the HK6 Demo, a new legal issue arose regarding who would own the digital recordings imprinted on the disc.  A separate agreement was made (the "CD Ownership Agreement"), providing, among other terms, that the Co-Managers would retain (1) full ownership and exploitation rights in the HK6 Demo until the Continuing Loan was fully repaid and (2) an inalienable right to twenty (20) percent of any future profits from the HK6 Demo.

33.  During the Band Performance Period, Co-Manager Ptak focused on organizing the development of the Band's newly recorded high-quality, and consequently highly-marketable, sound tracks.  Within her zone of responsibility, Co-Manager Frisch directed the organization of the Band and industry outreach for the Band, particularly focusing on the task of radically improving all aspects of the Band's public image.  Frisch, among a myriad of tasks (1) reorganized the manner in which the Band arranged live performances; (2) standardized the Band Members' e-mail addresses; (3) insured that the Band Members would regularly monitor their Myspace.com website (the "Myspace Website"); (4) organized photography shoots; and crucially, (5) maintained and constantly updated a large database of contacts made with A&R personnel at potential contracting Major and Independent Labels.

34.  During the Band Performance Period, as mentioned above, the Co-Managers went much further in their support of the Band than industry standards would ever expect a band manager to do, paying for living expenses, recording expenses, and outreach expenses.

35.  Also during the Band Performance Period, under a separate agreement, Geare composed various songs suitable for the Band, all of which were paid for individually by Ptak.

36.  Also during the Band Performance Period, the Band performed regularly at a club in Los Angeles called the Troubadour.  The Co-Managers used these regular performances as a means for the Band to audition for recording industry executives by inviting them to the Troubadour to witness a live performance of the Band.  During this period, the Co-Managers continued to subsidize the daily living expenses of the Band Members.  These continuing payments were made in reliance on the representations of the Band Members that they would work systematically to improve the artistic quality and reputation of the Band.

37.  In or about February 2007, two members of the Band (Geare and Riley collaborating with Elena), but not the Band itself, were asked to make a series of recordings for a software engineer, Craig Franklin ("Franklin").  Franklin owned a tiny independent label, and had composed some songs (the "Franklin Songs") in a style strikingly dissimilar to that in which Hong Kong Six was seeking to publicize itself.  Franklin proposed to compensate these musicians for a series of projects to record the Franklin Songs (collectively the "Franklin Project") on a work-for-hire basis.

38.  The Co-Managers certainly did not see this engagement as being directly beneficial to the success of the Band.  However, predicated on one crucial condition (the "Co-Managers' Condition"), they were willing to accept the Franklin Project as a satisfactory opportunity for the Band Members to earn extra income.  The Co-Managers' Condition (the "Name/Likeness Prohibition") was that the Band Members' 'names and likenesses' absolutely must not be used to publicize the Franklin Songs to prevent damage to the image of Hong Kong Six that they, with the assistance of Kane, had carefully built up over the course of more than a year.  Sadowsky and his assistant Shen were engaged to defend the Band's image and interests in the negotiations with Franklin especially in relation to the Name/Likeness Prohibition.

39.  Franklin, however, had other ideas.  During the ensuing negotiations, Franklin repeatedly attempted to weaken or eliminate the Name/ Likeness Prohibition.  When the Co-Managers realized Franklin's determination to exploit the 'names and likenesses' of the Band Members involved in his project, the Co-Managers reminded the Band Members (1) that they were

p. 10

the Band's exclusive manager; (2) that the Band and the Band Members were obligated to make all contractual arrangements through them; and, (3) that the Band and the Band Members were indebted to the Co-Managers both for the outstanding Continuing Loan and their Management Commission on any music industry earnings.

40. In the course of acting as one of the exclusive Co-Managers for the Band, Ptak has registered both the songs written for him pursuant to the separate agreement cited in ¶35, (the "Work-For-Hire Songs") as well as all other sound recordings financed by the Co-Managers (the "Funded Sound Recordings") as works-for-hire with the United States Copyright Office. Ptak has also registered "Hong Kong Six" as his trademark with the United States Patent and Trademark Office.

41. Within the context of the relationship that existed prior to Defendants' breach, use by the Band of the Work-For-Hire Songs and Funded Sound Recordings was permitted. However, given the breach and the posting of these sound recordings on public websites, Defendants began to infringe on Ptak's copyright. On information and belief, the Band has also continued to use the trade name "Hong Kong Six" especially in relation to a website myspace.com/hongkongsix, and thus Defendant Musicians are also infringing Ptak's trademark. These infringements began in August 2007 and continue to the present day.

42. A recent settlement agreement and mutual release signed by the Plaintiffs and Geare ("the Geare Settlement") affects the issues of infringement. The Geare Settlement does grant Geare conditional rights to market and digitally propagate the Funded Sound Recordings. However, at present, the terms of the Geare Settlement do not apply to any of the instant defendants. Furthermore, as is explained in the following paragraph, even if the terms of the Geare Settlement did apply to all the instant defendants, there would still be infringement occurring.

43. Section 3.b of the Geare Settlement states, "The Settling Defendant [Darren Geare] insures and warrants that no marketing, licensing or sales of the Songs with Plaintiffs Interest has occurred or shall occur unless Plaintiffs Robert Ptak and Renee Frisch receive explicit and express credit as Executive Producers." Currently, digital copies of the Funded Sound

p. 11

Recordings are posted online at the Band's page on the popular 'myspace' networking site and also at innercirclemgmt.com. Innercirclemgmt.com is a website controlled by a man named Rodney Afshari ("Afshari") who the Band engaged as a manager after breaching contract with Plaintiffs. Therefore, on information and belief, the posting of one of the Funded Sound Recordings on Afshari's website was done with the approval of the Defendant Musicians. Since no reference to Plaintiff Ptak or Frisch's work as executive producers exists on either the Band's Myspace website or Afshari's Innercirclemgmt.com website, the Defendant Musicians would be breaching the Geare Settlement Agreement even if its terms applied to them whereas they do not.

44.   On or about the third week of July 2007, the members of the Band, upon information and belief, prodded by the Defendant Attorneys, Franklin and Afshari simply stopped dealing with Ptak, and proceeded to make their own contractual arrangements both individually and as a band. Since these arrangements lack any provision to pay Ptak in any manner whatsoever, they constituted an obvious breach of both the Band's exclusive Management Agreement with Ptak as well as the CD Ownership Agreement.

45.   On one occasion, Geare purported to repay the funds outstanding on the Continuing Loan to Ptak with a payment, on information and belief, taken from his earnings from Franklin (the "Purported Reimbursement"). However, this Purported Reimbursement represented only a portion of the accumulated debt on the Continuing Loan. The compensation required under the Management Agreement in a situation of Termination was not made; nothing to (1) Ptak for his services as manager including compensation for the time and effort he spent promoting and improving the quality of the Band's music; nor, (2) to Frisch for her services as Co-Manager; nor (3) to Kane for his services as graphic designer in designing all artwork, logos, and graphic designs which he supplied to the Band. Notably, Geare himself no longer stands by these former claims; and, in the text of the Geare Settlement, completely repudiated the notion that the Purported Reimbursement possibly could have served as equitable reimbursement for Plaintiffs role in aiding and financing the Band.

46.   Plaintiffs bring this action against the Defendants, jointly and severally, for

p. 12

breach of the contracts that were in place with all Plaintiffs, seeking damages for non-payment of services already rendered and for lost profits from the revenue stream that the performance of Defendants' obligations would have generated as Hong Kong Six was to become more profitable.

      a.  Frisch also sues for income lost in leaving former employment in detrimental reliance on the promises made by Defendants to retain her as their Co-Manager and to pay her, a half portion of the compensation originally promised to Ptak.

      b.  Ptak also sues for recovery of the unpaid loans made to Defendants directly or through Geare as an intermediary.

      c.  Plaintiffs further seek to impose a constructive trust on the earnings of the Defendant Musicians in the music business, individually and jointly, as members of Hong Kong Six or under any other name the Defendants may use, individually or jointly, in the future.

      d.  Plaintiffs also seek a preliminary and a permanent injunction to prevent the alteration and to impose joint control of the Band's Myspace Website whose notoriety is due largely to the Funded Sound Recordings that are published on it.

      e.  Ptak also sues for fraudulent inducement (1) regarding his agreement to pay the living expenses of the Defendants while they were surreptitiously spending time on other projects which were not even in the best interest of the Band (2) his temporary waiver of his Loan Priority (described below) in regard to income from the Franklin Project, and (3) his rendering of a conservative invoice (described below) in reliance on Geare's false promises to negotiate in good faith regarding the Termination Commission (described below).

      f.  The Complaint further states causes of action for copyright, trademark infringement and defamation of character.

      g.  Plaintiffs further sue the Defendant Attorneys for professional malpractice, tortious interference with contract and tortious interference with prospective economic advantage and demand related economic and emotional damages.

BACKGROUND OF RECENT DEVELOPMENTS WITHIN THE MUSIC INDUSTRY

p. 13

47.  Over the last century, within the music industry, there has been a steady reduction in the importance of 'live' performances and a greater emphasis on recordings and other methods of reproducing performances.  As the technology of reproduction and sound generation has advanced, so generally has the economic domination of the performer by the companies that produce records, tapes, compact discs, videos, and other media designed to transmit structured sound to the consuming public.  In this modern technological age, the sound of a musical group on a recording is typically not even heard by the consuming public until the separate elements of each musician or a small number of musicians are combined in a recording studio by technicians called 'mixers' who operate as virtuosos of electronic equipment.

48.  The music 'industry' has been no stranger to the phenomenon of merger of giant corporations that is so omnipresent in the wider economy; and, if anything, in the music industry, this phenomenon has been particularly pronounced.  This has led to a situation whereby the performing artists, with the occasional exception of certain 'superstars', have their economic fortunes guided by the executives of conglomerates whose knowledge of and interest in music *per se* is overshadowed by considerations of corporate governance, investment strategy and copyright litigation.

49.  Recently, the cost of producing professional quality music ('songs' or 'tracks') has plummeted due to the wide availability of sophisticated software packages which run on standard personal computers.  Cheap or even free internet distribution has allowed amateurs to broadcast their music to millions of consumers.  However, it is a more difficult struggle than ever before, yet potentially incredibly lucrative, to join the 'club' of established performers whose music is (1) distributed in retail stores, (2) played on television and radio, and most importantly (3) purchased by consumers, thus enabling the performers to be financially remunerated for their artistic abilities.  To join this 'club', it is not enough to simply record music, one must find a means of distribution.

50.  There is a significant distinction, well understood within the music industry, between a `recording' contract, a 'publishing' contract and a `distribution' contract.  Historically,

p. 14

record Labels offered artists financial advances, and sometimes (for successful artists) substantial advances ("Advances") to sign record deals.  In return, however, the Labels have typically demanded the rights to the entirety of the artist's or artists' copyrightable work for many years, and have utilized the extremely lengthy statutory period permitted for copyright protection to reap the lion's share of music industry profits.  One of the most significant alternative developments in recent years has been a strategy developed by established artists (a "Direct Distribution Strategy") who, in the interest of retaining the copyrights to their works, have attempted to circumvent record Labels entirely by attempting to negotiate deals directly with publishing and/or distribution companies.  In these situations, the artists often accept smaller Advances or decline to accept Advances entirely and, in return, receive a larger slice of the profits from the publishing or distribution company.

51.  By using Plaintiffs' contacts, skills and funds, Defendants could hope to either get signed by a Major Label, or implement the type of Direct Distribution Strategy which typically is beyond the reach of all but established artists.  Notably, Ptak's initial 'lead' was with an executive of EMI, on information and belief, the world's largest publishing company, rather than with any Label.  Later, unaware of Defendants being on the brink of complete contractual breach, Ptak closed a very flexible and favorable deal with a small Independent Label which would have opened the door to independent distribution company, Redeye ("Redeye"), without making the onerous concessions which a Major Label or large Independent Label would have demanded.

52.  The typical performance unit in all styles of 'popular' music is the formation of small groups of performers (usually four [4] to six [6] individuals) adopting distinctive brandable names ("Groups").  If organized in a conscious sensible fashion, a Group will form pursuant to a partnership agreement and then will contract with a personal manager who will assist the Group to obtain publicity, perform engagements, and acquire a recording contract with a Label or a distribution contract with a distribution company, possibly with the aid of a public-relations representative and a booking agent.  See *No Suit Required*, by Jeff Howe, Wired Magazine, September 2006, attached as Exhibit "A".

p. 15

53.  It is difficult for an inexperienced unknown group, to obtain any recording contract whatsoever, much less a contract whose terms are at all favorable to the performers.  This circumstance has evolved from economic realities whereby most Groups fail to achieve sufficient sales to recoup the investment which the Labels must expend to finance the production and distribution of a mass market record or compact disc.

54.  In the past, Labels were willing and able to invest in new Groups on the theory that the profits from their successes would cover the losses of their failures.  However, in the last few years, the entire music industry has suffered an economic drought.  The Major Labels—which rely on compact discs for most of their revenue—are in decline.  Compact disc sales in the United States have dropped more than twenty (20) percent from a peak of $13.4 billion in 2000.  (See Exhibit "A").

55.  Yet a thriving market for music remains.  With the ubiquity of digital recordings distributable through a wide variety of media, including peer-to-peer networks, the Internet, the iPod, and other digital technologies—the world is deluged with, and still, in a variety of ways, pays for music.  The decline of conventional sales of music recordings (signaled by the disappearance of the largest nationwide chain of retail outlets), has forced the industry to aggressively explore and exploit various alternative sources of revenue from ringtones and concert tickets to licensing agreements with television shows, movies and videogames.  (See Exhibit "A").

56.  Labels have always been the center of gravity in the industry—the locus of power, ideas, and money.  Labels have discovered the talent, promoted the songs, and placed the product on the air and into stores. Their goal was to increase sales of units of recorded media be they vinyl records, compact discs or, if synched with video, DVDs. "The labels were never in the business of selling music," says David Kusek, vice president of Boston's Berklee College of Music and coauthor of The Future of Music, "They were in the business of selling plastic discs."  (See Exhibit "A").

57.  In this world dominated by gigantic Major Labels, the performers themselves generally have earned very little from the sale of their own artistic creations.  The Labels charge

p. 16

the costs of production, marketing, and promotion ("Labels' Costs") to the performers as a deduction against sales. The Labels then bind the performers for many years under contracts that compel the musicians, year after year, to produce albums exclusively for *their* Label (as peasants in the middle ages grew crops for *their* Lord) with renewal options being possessed exclusively by the Labels. Even if a record sells a million copies and covers Labels' Costs, the performers' share of any extra revenue is usually less than ten (10) percent.

58. Worse yet, musicians are generally initially signed when they are virtually or completely unknown and are thus grateful to be offered any contract whatsoever. Therefore, by using these simple contractual devices, Labels typically retain the entirety of the copyrights to the recordings which allow them to profit from the musicians' catalogs indefinitely. "It's as if you received a loan for a house, but when you finish paying off that loan, the label says thank you and keeps the house," commented a leading well known Canadian rock vocalist. Progressive industry executives have come to believe that this traditional model is antiquated. "The future of the business isn't selling records," said one executive recently. "It's in selling music, in every form imaginable." That executive is pioneering the establishment of so-called artist-run labels. "We become the management company, the publishing company, and the record company rolled into one," he says. (See Exhibit "A").

59. This cutting-edge business model inspired Plaintiffs to attempt to build a management company and eventually a label in alliance with the musicians of the Band, rather than to employ contractual devices to merely exploit them. Ironically, Plaintiffs took more risks, did more work and offered these unknown and unsuccessful Defendant Musicians a better deal than any manager or even any record label would offer anyone other than a superstar. In return, through their complete breach of all their agreements with Plaintiffs, Defendants have placed Plaintiffs (who, as the incipient label, put up all the money and consequently took all the risks) in a situation dramatically worse than the most exploitative traditional record contract ever placed the typically unrepresented and helpless musicians.

60. In fact, despite the settlement of Plaintiff's with Geare, Plaintiff's music

p. 17

management company lies ruined because of the time sensitive nature of the music industry. Despite Geare now agreeing to relatively fair splits on income from the various Funded Sound Recordings (something that could have been negotiated in a matter of days instead of a year if not for the Defendant Attorneys malpractice and tortious interference), the Defendant Musicians failed to 'specifically perform' the performances which they committed to in 2007 which caused Plaintiffs to lose an advantageous 'bridge offer' from a label.  The situation was brought about, upon information and belief, by the malfeasance of the Defendant Attorneys who turned Plaintiffs' concept of a musician/ management alliance on its head by allying with Franklin in Franklin's attempt to circumvent the Name/Likeness Prohibition and destroy the Band's image and long term marketability.  Upon information and belief, the Defendant Attorneys paid an instrument role in inducing Geare and the Defendant Musicians to cease the good faith negotiations with Plaintiffs that they intended to engage in, and instead, to engage in the fraudulent scheme of the Purported Reimbursement Check.

## THE FORMATION OF THE AGREEMENTS BETWEEN
## PLAINTIFFS AND DEFENDANTS

61. When Geare managed to reestablish contact with his old friend Ptak, in December, 2005, Geare was still at the lowest level of the music industry economic totem pole. While Geare had managed to organize the Band, he had been unable to promote it except for the production of the amateurish Geare CD which he hoped to shop to Labels.  Knowing that Ptak had enjoyed many years of success in the music industry and therefore possessed many valuable music industry contacts, Geare's initial request to Ptak was nothing more than to attempt to influence his contacts merely to listen to the Geare CD.

62. After listening to the Geare CD, one of Ptak's contacts, a then prominent music-industry executive, Kevin Hershey, ("Hershey") (1) agreed that the band had potential, (2) inquired as to whether Ptak was the Band's manager, and (3) if not, whether the Band currently had a manager.  As Ptak had not yet become the Band's manager, he merely informed Geare of Hershey's response.  In response to this news, an excited Geare humbly appealed to Ptak to

p. 18

become the Band's exclusive manager.

63.   As a musician, and possessing a pro-musician mentality, Ptak did not leap to accept Geare's proposal, but rather informed Geare that he would consider the offer.  Over the course of the next several weeks, Geare received an offer from a band manager, Vincent Pilegge ("Pilegge") who desired to manage the Band.  Although Ptak encouraged Geare to research Pilegge carefully and to consider Pilegge's offer, Geare concluded that Pilegge would be a bad choice and renewed his entreaties toward Ptak.

64.   Soon afterward, Ptak purchased and mailed to Geare a leading book on music industry business contracts written by Donald Passman, Esq. (the "Passman Book").  Ptak sent this educational tool to Geare with the magnanimous intention to insure a level playing field in the pending negotiations between himself and the less experienced Geare.  Geare read at least the portion of the Passman Book that covers compensation for Band Managers; in that chapter, Passman asserts that "Managers typically get from 15% to 20% of your gross earnings, with the majority getting 15%."  See, *All You Need to Know About the Music Business*, Donald S. Passman, Esq., 2006 ed., Commission Overview, pps. 28, 29, attached as Exhibit "B".

65.   After reading the passage, from the Passman Book, quoted above, Geare proposed that Ptak (as agent for the incipient Ptak Mgmt. Co.) be given the higher end of Passman's proposed commission range, namely twenty (20) percent.  Geare proffered this larger share in consideration of Ptak's (1) ability to serve as the executive producer on future albums, (2) industry connections, and (3) willingness to invest funds in the Band.  In addition to Geare's proffered twenty (20) percent commission, the parties proposed the following additional terms:

a. If terminated, Ptak would receive a ten (10) percent Termination Commission on (1) any material written, recorded or performed, and/or (2) any contracts negoti-ated or formed in the period (the "Band Performance Period") running from the formation of the Management Agreement to the Termination ("Management Period Material") whether the Management Period Material be published or performed, for a period of years, according to industry standards; (See ¶25),

p. 19

    b. Ptak would handle all money received through any music industry deals to which the band was a party ("Control of Music Industry Income");

    c. Ptak would be permitted to reimburse himself in an amount equal to the Continuing Loan before any money would be disbursed to the Band (the "Loan Priority");

    d. the Loan Priority would constitute a right separate from and exercisable simultaneously with Ptak's right to receive the Management Commission; and,

    e. the Band would follow Ptak's direction in their professional activities and permit Ptak to market them as performers on music recordings to existing music Labels and also as a live act.

  66. In March 2006, prior to Geare's arrival in New York, Ptak retained Sadowsky. Ptak hired Sadowsky pursuant to an oral agreement (the "Sadowsky Oral Retainer") to represent his incipient management company ("Ptak Mgmt. Co."), whose initial client was to be Hong Kong Six. Ptak hired Attorney Sadowsky with the intent that Attorney Sadowsky would serve both (1) to represent Ptak Mgmt. Co. in negotiations with Labels and other potential customers and licensees of the Band's music; and, (2) as a transactional mediator to develop a fair contractual relationship between Ptak Mgmt. Co. and the Band, as well as with other artists that Ptak Mgmt. Co. might eventually represent.

  67. Ptak specifically told Attorney Sadowsky of horrific past experiences with Groups he had belonged to having been broken up by partisan attorneys representing individual group members. Consequently, Ptak informed Attorney Sadowsky of his desire to retain a single attorney to represent both Ptak Mgmt. Co. and its musician clients on an equitable basis, with partisan advocacy reserved for the outside world. Attorney Sadowsky agreed to serve Ptak Mgmt. Co. on these proffered terms, referred to above as the Collaborative Attorney Role.

  68. As compensation, Ptak proposed that Attorney Sadowsky receive, on any deal to be negotiated with the participation of Attorney Sadowsky's law office, five (5) percent of all music industry gross income earned by the clients of Ptak Mgmt. Co. referred to above as the Percentage Compensation Scheme. Attorney Sadowsky also eagerly accepted these terms.

p. 20

a.  Ptak purchased a ticket for Geare to fly to New York in March 2006 ("Geare's New York Trip").  On Geare's arrival, Ptak and Geare jointly met with Attorney Sadowsky.  At that meeting, and at various other junctures during Geare's New York Trip, (1) Ptak and Geare orally agreed to be bound by the terms of the Management Agreement, and (2) Geare ratified the Percentage Compensation Scheme for Attorney Sadowsky.  The essential terms of the Management Agreement were memorialized in many writings on the part of Geare and the other Band Members from early 2006 through July 2007.  The Continuing Loan commenced upon Geare's arrival in New York with Ptak paying for Geare's transportation, housing and meals and continued to the date of Defendants' breach in July 2007.

b.  From the commencement of the Management Agreement, by music industry standards, the Co-Managers provided far more services and support to the Band than a Group's manager would typically provide.  In fact, the Co-Managers contributions were more similar to the advance royalty payments provided by a Label, even by a Label to an already successful artist.  These services eventually included: (1) formulation of an overall marketing strategy; (2) active direction of the quality of the musical product with the Co-Managers serving as executive producers; (3) creation of an Internet marketing strategy and development of the Band's MySpace Website; (4) organization of all sales or production contacts into one common database; (5) production of demonstration compact discs; (6) direction and funding for professional publicity; (7) purchase or loan of musical instruments including a Fender "Jaguar" electric guitar; (8) distinctive logos produced by Kane; and, (9) the production of a professionally produced music video.

c.  One of the most important contributions by the Co-Managers to the Band's development was to pay Elena to record new musical 'tracks' first of Defendant Geare (while he was still in New York) and then, of the entire Band (in Los Angeles).  The Co-Managers also funded Elena's relocation from New York to Los Angeles, including air fare and living expenses, and lent or bought much of the equipment Elena needed to create a new recording studio.  The purpose of this investment was to give Elena an opportunity to record tracks per-

p. 21

formed by the Band under optimum conditions.

69.  Before entering into their Management Agreement with the Co-Managers, the Band was in need of musical development, but was more drastically in need of development of its sense of publicity.  The Band's initial CD (the Geare CD) had been released on a tiny Independent Label, but according to a recognized record-industry reporting agency, Soundscan, it had sold only 250 copies—a figure so minuscule that it can fairly be deemed non-existent.

70.  In contrast, by August 2006, the Band had at its disposal (1) a new professionally-recorded and professionally-packaged demonstration compact disc (the "HK6 Demo") packaged with the professional album artwork supplied by Kane; (2) all-new photography by renowned rock photographer Alexx Henry; (3) a professionally produced video, (4) an improved internet strategy; and, (5) better instruments with which to perform.  The team assembled by the Co-Managers began to 'shop' the Band to a broad spectrum of Major Labels and received early serious interest from several Major Label executives including most centrally Diana Fragnito, then a Vice-President at Epic Records, a Major Label.

71.  Numerous e-mails exchanged between the Co-Managers and the Band Members attest to the fact that the Band Members recognized Ptak and Frisch as their Co-Managers, were delighted with their work, and were grateful for their investment in their potential success.  As a typical example as early as July 21, 2006, Defendant Geare wrote to Aaron Wilhelm, an executive at Nettwerk Producer Management Company "Things are going really great—we have excellent management out in New York."

72.  During the Band Performance Period, the Band was in full acceptance of the terms of the Management Agreement and certainly did not object to the provision which required that (1) all licensing proposals be sent to the Co-Managers, in order (2) to enable them to conduct all negotiations with any other contracting party and (3) to issue their final approval for any resultant licensing agreement.  For example, as early as August 26, 2006, Defendant Geare sent even a very small licensing agreement to the Co-Managers for their negotiation and approval.

73.  The August 2006 completion of the HK6 Demo presented a new opportunity

p. 22

to exploit the combined talent of the Band; but it posed issues that fell outside the scope of the Management Agreement. Although the recordings on the HK6 Demo (the "HK6 Masters") were primarily intended to attract interest from existing Labels, they constituted valuable intellectual property as they could potentially be re-mixed and re-issued as a commercially viable product. Since the Co-Managers had entirely financed the production of the HK6 Demo, incurring expenses which augmented the Continuing Loan, there was an outstanding question as to what the nature of their ownership of the HK6 Demo should be.

74. The completion of the HK6 Demo with its significant distribution potential led to a second oral agreement which centered on defining the ownership of the intellectual property (1) whose production the Co-Managers were continually financing, and, (2) the Band and Elena were continually producing (the "CD Ownership Agreement"). However, upon information and belief, unlike the Management Agreement, the terms of the CD Ownership Agreement were never clearly worked out to cover potential contingencies such as the breach committed by Defendants (detailed below).

a. According to the United States Copyright Act and the common law agency principles which determine whether a work-for-hire relationship exists, the Co-Managers were clearly the co-owners of all rights to the Funded Sound Recordings on account of being the Band's employers, and, consequently, according to work-for-hire principles, the author. In fact, the Band Members were eager to be employees of the Co-Managers and even attested to Ptak possessing the authority to fire them. For example, on February 17, 2007, Defendant Riley, in a routine circular email to all Band Members and support personnel regarding an upcoming show stated, "Alright, everybody get back to me on this, or *Rob* [referring to Ptak] *says your* [sic] *fired*" [emphasis added]. Indeed, the Co-Managers, as employers under common law agency principles, did not merely pay for studio time, but rather paid, at various times, for the Band Members' rent, food, gasoline, air travel, instruments, web presence, photography, video work and staff support.

b. However, given his pro-musician mentality, Ptak, on behalf of the

p. 23

Co-Managers, may actually have proffered an offer more generous to the Band than the United States Copyright Act and its jurisprudence (based on common law 'agency' principles) ("Copyright Jurisprudence") might have granted had there been no express contract whatsoever. In this regard, it is important to note that Ptak was not, in this endeavor, represented by a zealous attorney advocate; quite to the contrary, he had hired Attorney Sadowsky to function as a neutral transactional mediator representing both sides.  Yet Attorney Sadowsky, even prior to engaging in malfeasance against Plaintiffs, simply failed to do any legal drafting.

c.  For example, on September 27th, 2006, Ptak attempted to enlist Attorney Sadowsky to draft the much needed formal memorializations of the Management and CD Ownership Agreements writing in an email, "I was hoping we could speak this week to develop an agreement for the upcoming recording of the HK6 masters."  Attorney Sadowsky responded on September 28th, 2006 by e-mail stating, "Ok, let's get on it. My wife is due with the baby TODAY, so I'm not sure about scheduling."  Yet eight (8) months later, Attorney Sadowsky still had not generated a draft of any formal memorialization of the existing Management and CD Ownership Agreements.  On information and belief -- while Attorney Sadowsky was always delighted and always possessed sufficient time to mail demonstration compact discs to his music executive friends, attempts to get him to draft contracts were always met with excuses and delays, yet never by refusals.

d.  Thus, during the negotiations regarding the CD Ownership Agreement, although both sides were titularly represented by Attorney Sadowsky, hired to act in a neutral transactional capacity, they were in practice, unrepresented.  To make matters worse, Ptak greatly valued the services of Attorney Sadowsky's office on account of Attorney Sadowsky's reputation in the music industry; and consequently, he feared that the retention of another attorney, even acting in the background as a scrivener, might convince Attorney Sadowsky's office that the Co-Managers and their incipient company were a disloyal problem client.

75.  On information and belief, only four terms of the CD Ownership Agreement,

were agreed to orally by the Co-Managers and the Band Members:  (1) the Co-Managers were to receive a minimum of twenty (20) percent of any income stream emerging from the tracks on the Funded Sound Recordings; (2) the Co-Managers were to receive Executive Production credit for the Sound Recordings; (3) until such time as the Co-Managers were fully paid back for their contributions to the Continuing Loan, the Co-Managers would have all the controlling rights as an employer/ author which Copyright Jurisprudence would grant them in the absence of an express agreement; and, (4) all terms relevant to the Management Agreement such as Ptak's Control of Music Industry Income and the Loan Priority would also apply to the CD Ownership Agreement.

      a.  The Co-Managers plead their ownership of all sound recording tracks which they financed under Copyright Jurisprudence and, as an alternative or additionally, if the CD Ownership agreement proves to be enforceable, their rights under the CD Ownership Agreement.

      b.  Plaintiff Ptak does not claim and has not claimed the same rights with respect to each song.  In some cases, the rightful primary author of the score and lyrics remains Defendant Geare with the other Defendants as secondary contributing composers.  With respect to some of the Funded Sound Recordings, Plaintiff Ptak has claimed only copyright ownership in the sound recordings which he financed according to work-for-hire principles rather than the lyrics and score.  In other cases, Plaintiff Ptak himself suggested lyrics and changes to the score; in such cases, Ptak has claimed a copyright interest in the song as a joint author, as well as copyright ownership of the sound recordings that he financed.  However, Plaintiff Ptak purchased many songs outright subject to an express oral agreement that was immediately clearly memorial-ized in an e-mail exchange and by the issuance and negotiation of a check; with respect to these songs, Ptak has claimed exclusive copyright ownership. (See following paragraph).

      c.  As was stated above, Plaintiffs copyright claims have been effected by the Geare Settlement Agreement which granted rights very similar to those which Plaintiff's sought.  However, as was also stated above, Geare has never been in conformity with Section 3.b. of the Geare Settlement Agreement and its terms have never applied to the other

p. 25

Defendant Musicians.

76.  Throughout the fall of 2006, the Band received vastly increased interest from Major Labels, but no recording contract had yet been signed.  Geare had a tremendous desire to earn whatever money he could without having to take a job outside the entertainment industry.  In consideration of his respect for Geare's desires and his creative skills, Ptak suggested to Geare that he stop working at his typical menial jobs, and instead stay home and write songs that Ptak would purchase from him pursuant to a work-for-hire agreement.  Ptak and Geare agreed that Ptak would pay Geare a fee of $37.50 per song for each of these songs (the "Work-For-Hire Agreement") which memorialized the purchase of (the "Work-For-Hire Songs").

77.  Although the Work-For-Hire Agreement was also negotiated orally, it was memorialized soon after in a series of e-mails beginning with a communication from Geare to Ptak dated October 14, 2006, which stated in part, "Hey Rob, just wanted to see if you could pop the check in the mail as soon as you can—thanks, man! I sent over 10 recordings. . . I think it was $75 for every two songs—so, total, that's $375 ...thanks so much, man."  During the period that Ptak was paying Geare to write songs under the Work-For-Hire Agreement, the Co-Managers continued to contribute to Geare's daily living expenses over and above the amount he paid Geare to write the Work-For-Hire Songs.

78.  The Management Agreement, the CD Ownership Agreement, and the Work-For-Hire Agreement governed the relationship between the Plaintiffs and the Defendants until the early summer of 2007.  The Defendants continued to be immensely satisfied with the work of the Plaintiffs and repeatedly stated as much in a continual succession of e-mails.

79.  As 2006 rolled into 2007, the Co-Managers expanded their scope of activities to the point that the Ptak Mgmt. Co. began to transform itself into a *de facto* start-up Independent Label.  More capital was invested in re-recording some of the songs that had appeared on the first version of the HK6 Demo as well as some of the Work-For-Hire Songs in order to master, mix and imprint a new, fully professional album (the "Hong Kong Six Album").  Elena supervised the Production of the Hong Kong Six Album utilizing the Los Angeles Studio that had been funded in

p. 26

part by the Co-Managers (See ¶30).  In the meantime, the Band was receiving increasingly intense interest from a wide variety of Major Labels and also smaller Independent Labels.

80.  By the spring of 2007, the Ptak Mgmt. Co. had begun to manage a second artist, Milena Selkirk ("Selkirk"), a personal friend of a successful mainstream musician, Russell Lissack ("Lissack"), the guitar player for a very successful British band, Bloc Party.  A rare opportunity soon presented itself with Bloc Party touring the United States in the winter of 2006–07 to record Selkirk and Lissack (the "Pin Me Down Project"); and, the Co-Managers moved expeditiously to take advantage of this opportunity with a further investment of time, money and effort.

81.  At this point, the Co-Managers had built a 'perfect storm' of interest around Ptak Mgmt. Co. whose transformation into an incipient Label (the "Ptak Label") was by then, for all practical purposes, complete.  With regard to the Pin Me Down Project, they had attracted the attention and participation of a mainstream artist responsible for selling over one million compact discs and had acquired priceless releases from each of Lissack's labels permitting Ptak Mgmt. Co. to market the Pin Me Down CD's.  With regard to Hong Kong Six, they had turned a group of talented musicians who had been formerly unable to present a professional image to the music industry or even their fans into a 'hot' marketable commodity.

82.  At this point (the winter and early spring of 2007), traffic on the Band's Myspace Website was burgeoning from virtually nothing to respectable levels; music-industry executives were regularly attending the Band's shows; and early-stage sponsorship and licensing deals had been executed with (1) an independent record Label, Xemu Records ("Xemu"), and (2) the energy-drink manufacturer Red Bull.  Red Bull, for its part, had just begun to perform its part under its sponsorship agreement.  The Band was inspired by this transformation of the Ptak Mgmt. Co. into the Ptak Label; and, the Band Members felt strongly that Frisch's organizational skills were needed to further develop the project.  On March 23, 2007, relying on the Band's commitment to develop themselves systematically and fulfill their obligations under their agreements with the Co-Managers, Frisch left MTV Networks to work full-time for the Ptak Label, primarily to assist in the management of the Band.

p. 27

83.  The agreement with Xemu was particularly significant because Xemu's principal, Cevin Soling ("Soling"), was in complete agreement with Ptak's marketing plan for the Band ("Ptak's Plan").  Ptak's Plan called for Geare to tour with the Pin Me Down Project in place of Lissack ("Geare's Participation") whose availability was limited by prior commitments and contracts.  Reciprocally, the Band would be permitted to play its own set for the many music industry insiders who, on account of Lissack's participation in the recording of its album, possessed great interest in PMD.  Soling was one of many music-industry experts who vigorously agreed that Geare's Participation would guarantee the Band increased exposure to press outlets, industry executives and, most importantly, Bloc Party's large and valuable fan base.  Contingent upon the Band's cooperation with the Pin Me Down Project, the Xemu agreement (the "Xemu Deal") was executed and deemed to be mutually binding by (1) the Co-Managers and (2) Soling.

84.  The terms of the Xemu Deal called for Xemu to provide funds to 'bridge the gap' between the Band's contemporaneous profitability and the considerably improved financial profile which it would need to demonstrate to 'get signed' by a Major Label.  Simultaneously, the Xemu Deal would provide both internet and 'brick and mortar' (physical retail) distribution channels for the Band so that the Band might eventually develop to the point where it would not need a deal with a Major Label.  The Xemu Deal was to provide internet distribution through its own excellent website as well as 'brick and mortar' distribution through Redeye.  Xemu's offer was particularly favorable to the Band because Soling was willing to limit Xemu's royalty share to a small percentage that would not interfere with any potential deal that might be offered by a Major Label.

85.  However, the Xemu Deal required a significant level of cooperation between the Band and the Pin Me Down Project.  With Lissack unable, on account of prior contractual relationships, to tour with Selkirk, it was crucial for Ptak and Frisch to be able to provide Selkirk with a professional-quality band.  Conversely, it was crucial for the success of Hong Kong Six to take advantage of this rare opportunity to intersect with Lissack's mainstream international fan base (the "Lissack Intersection Plan").  It was precisely the Lissack Intersection Plan that inspired

p. 28

Soling to offer such a favorable deal to Ptak for the Band.

86. Therefore, the Xemu Deal and Ptak's entire marketing plan was predicated on the Band touring as Selkirk's band with Geare agreeing to play a set of Pin Me Down songs as a substitute for Lissack (the "PMD Performance Contract"). In an e-mail dated June 27, 2007, Geare agreed to the PMD Performance Contract; but he never performed according to its terms and shortly thereafter breached all his contracts with Plaintiffs. Geare's failure to cooperate with the Pin Me Down Project greatly damaged the Band's prospects, made it impossible for Plaintiffs to perform their obligations under the Xemu Deal, and damaged Plaintiffs' credibility with potential investors, industry insiders who were aware of the PMD Performance Contract and were eager to see it come to fruition and even Plaintiffs other client musician. In fact, it is a measure of Plaintiff's damage, that despite the PMD project garnering massive favorable media exposure in publications as mainstream as the London Times, no benefit has thus far accrued to Plaintiff's incipient management company.

## EVENTS LEADING TO BREACH

87. On April 15th, 2007, the Hong Kong Six Album was finally in the process of being imprinted. At that crucial juncture, Elena and Defendants Geare and Riley (the "Studio Group") informed Ptak that Franklin (See ¶37), owner of a 'vanity' record label, Romantic Realist Records ("Romantic"), had offered them $30,000 to record twelve (12) master recordings (the "First Romantic Project"). While side work for Romantic was a promising way to rapidly inject capital into the Band and vicariously to the Ptak Label, it had no expectation of achieving mass market sales to the general public. Furthermore, any association with Romantic presented the serious potential danger of damaging the rock-based image of the Studio Group, all of whom were still managed by the Co-Managers.

88. Franklin's label, Romantic, is termed a 'vanity' Label in the sense that, on information and belief, no one, not even Franklin himself, ever believed that his songs would widely sell to the general public or that his 'Label' would ever generate a profit. Franklin's 'Label' was not so much a business as the hobby of a very wealthy man who, upon information

and belief, has made a fortune entirely outside the music industry by designing computer operating systems with companies such as Green Hills Software for industrial, rather than entertainment applications. Green Hills Software describes itself on its website as having been "[f]ounded in 1982" and as having "grown to become today's technology leader for real-time operating systems and software development tools, supporting embedded developers in major companies world-wide."

89. The first contract negotiated by Ptak with Romantic on behalf of the Studio Group (the "First Romantic Agreement") was ready for execution within two days, on April 19th, 2007. However, on April 20th, as the contract was about to be signed, Franklin stalled the negotiations by demanding the addition of a new set of clauses to the proposed contract which (1) designated Los Angeles as the venue of any arbitration or litigation, and, in any such dispute, (2) would have forced the losing party to pay the victorious party's attorney's fees. In view of the vastly greater economic resources possessed by Romantic and the location of the Co-Managers in New York City, the inclusion of both these clauses would have put the tiny Ptak Label at risk of being dragged into prohibitively costly litigation in California.

90. On May 21st, 2007, after weeks of Franklin obstructing the negotiation of the First Romantic Agreement, Ptak was forced to assign the job of negotiating with Franklin to Attorney Sadowsky. On May 30th, without actually signing the contract, Franklin acceded to Ptak's counter-offer made six weeks prior by finally remitting a check in the amount of $18,000 to Elena who promptly forwarded it to Ptak (the "First Romantic Payment"). Ptak then promptly disbursed five (5) percent of the First Romantic Payment to Attorney Sadowsky for his legal fee under the terms of the Sadowsky Oral Retainer. See attached Exhibit "C".

91. Yet, a question remained in regard to the manner in which the remaining funds from the First Romantic Payment should be disbursed. Since the Co-Managers possessed the Loan Priority under the Management Agreement cited in ¶¶'s 45 & 65, it was their right to take the entirety of the First Romantic Payment as a partial payment toward the Reimbursement of the Continuing Loan. However, to force such an allotment of these funds away from the band and

p. 30

toward Plaintiffs could not have been farther from their intentions.

92.   On the contrary, Ptak had just closed on a $65,000 round of financing to promote the Hong Kong Six Album.  Although the Co-Managers would have liked the Studio Group to use the First Romantic Payment to repay the Continuing Loan as a show of good faith to Ptak's financial backer (even if it deprived the Band Members of capital for a few days), Ptak's stated intention was immediately to inject far greater funds to the Band Members and the marketing of the Hong Kong Six Album.  However, despite acknowledging his debt with Ptak, Geare was opposed to paying even a penny toward the Continuing Loan.

a.   Geare was, at that time, desperate for funds, not an atypical situation for him.  In late June 2007, Geare requested, in relation to the Franklin Project, that Ptak on behalf of the Co-Managers (1) temporarily waive his Right of Reimbursement, and (2) only in regard to this particular deal, permit Geare, to pay solely the Management Commission rather than make any Reimbursement toward the Continuing Loan ("Geare's Proposed Amendment").  Ptak, in an e-mail dated June 23rd, 2007, declared his willingness to accede to Geare's Proposed Amendment.

b.   However, Ptak simultaneously made two alternative proposals. Ptak proposed a first alternative scenario (which he described as "Plan A") whereby, contingent upon Defendant Geare acting in good faith, the Co-Managers would reinvest their commission in the promotion of the Hong Kong Six Album.  Yet, Ptak warned, this scenario would cause the Band's debt to the Co-Managers to further rise.  Ptak proposed a second alternative scenario (which he described as "Plan B"), whereby the Studio Group would use the funds from Franklin/ Romantic to pay off the Band's debt to the Co-Managers immediately, and in return, the Co-Managers would convey an eighty (80) percent interest in the revenue from the Hong Kong Six album to the Band.

c.   In either alternative scenario (Plan A or Plan B) (the "Alternative Scenarios"), the Co-Managers would retain, on a non-cumulative basis, both their twenty (20) percent share of the Hong Kong Six Album and their twenty (20) percent Management Commis-

p. 31

sion.  In a June 25th email, Defendant Geare rejected both of Ptak's alternative scenarios, rather choosing to stick with the original Management Agreement, and simultaneously ratifying and memorializing its terms.  Specifically, Geare chose to ratify the original Management Agreement by electing to take advantage of Ptak's willingness to accede to Geare's Proposed Amendment. Ironically, it was the negotiation of this limited amendment to the Management Agreement, rather than the work of any attorney, that finally spurred the parties to memorialize the Management Agreement.

93.  On information and belief, during late April, May, June and early July of 2007, Franklin attempted to use his substantial assets and furtive negotiating tactics to attempt to undermine the relationship between the Co-Managers and the Studio Group.  Prior to even informing Ptak of the existence of Franklin, in breach of the original Management Agreement, the Studio Group had accepted several thousand dollars of advance payments from Franklin (the "Early Franklin Advances") without the protection of a written contract and without paying any Management Commission to the Co-Managers.

94.  Nonetheless, after informing Ptak of the large scale of the project, Elena and Geare made numerous written representations to Ptak acknowledging the terms of the Management Agreement and pledged (1) that the Early Franklin Advances were a one time exception to their payment obligations under the Management Agreement, and (2) that they were fully committed to Ptak and Frisch continuing as their Co-Managers.  Far from expressing dissatisfaction with the work of the Plaintiffs, Elena and Geare expressed nothing but delight.  Examples of such expressions of satisfaction include:

a.  On May 8th, 2007, Elena sent a royalty statement regarding a totally unrelated project distributed through Sony Music to the Co-managers.

b.  On June 1st, 2007 Geare wrote to the Co-Managers, "I'm very happy right now . . . I'm very, very excited. I couldn't have done it with out you guys, so thank you VERY much!"

c.  On June 11th, 2007, Elena wrote to the Co-Managers, "I just spoke

p. 32

to Janis [Defendant Shen ] and she is sending me a copy of the contracts regarding stupid Craig. I will get them signed by the prick tomorrow.  Ciao Alex."

   d.  Geare wrote to the Co-Managers on June 14th, 2007, "we told Craig . . . we won't work until everything's signed and . . . with any work in the future, the contract needs to be signed before any work . . . gets done."

   e.  On June 24th, 2007, Geare wrote to the Co-Managers, "Craig is so stoked with what we're doing, he has said over and over that he wants to do at least two more projects after this for 26k a piece.  That's a total of $113,000 of tax-free money for 6 to 9 weeks worth of work . . . Not to mention $22,600 in your pocket. Rob, we know how hard you work. There isn't a day that goes by that I don't brag about what a hard working, kick ass manager that I have. I know there has been stress for you dealing with Craig's back and forth shit and his inexperienced ass. But man, I really think when you look at the cost/benefit aspect of this situation, I really think it's worth dealing with."

   f.  On June 25, 2007, Geare wrote to the Co-Managers, "I, again, am sorry if misinterpretations in the past have led you to believe that I don't want your help with negotiations or meetings or anything like that. I assure you it is NOT true. And if you look at my track record, you will see that it isn't true . . . The day I met Craig, I called you and got you in touch with him . . . The second Nanci Walker wrote us -- I instantly let you know. When I first met John and Larry at Tankfarm -- I instantly put you in touch with them. When I found Kyle the mixer -- I instantly got you in touch with his manager. When I met Ken Andrew's partner -- I instantly got you in contact with her. I could probably think of a ton more examples of everytime [sic] anything gets to a "real" stage, me [sic] instantly putting you in touch with them. So, again, I'm sorry if there's been misinterpretations, but please look at my track record here."

   g.  On June 27th, 2007 Geare wrote to the Co-Managers, "I believe my music equipment debt to you is somewhere between $1300 - $1500. Please let me know if I'm off. From here on out, I will send you a portion of that equipment debt (of course, on top of your 20% commission) . . . Rob, you are the man -- I've always thought so -- my respect for you as a

p. 33

manager, businessman, musician and human being goes beyond words."

95.  On or about June 5th, 2007, Franklin sent a further payment of $10,000 (the "Second Romantic Payment") as an advance payment toward the development of a new set of digital song recordings (the "Second Romantic Project").  Once again, correlating with the course of dealing set up by Ptak and the Band, Franklin sent the check to Ptak who promptly paid Sadowsky his 5% according to Sadowsky's Percentage Compensation Scheme, a facsimile of that check is attached as Exhibit "D".  By this time, Franklin was, as mentioned above in ¶84e, tempting the Band with studio work of up to $113,000.  Yet Franklin had still not signed the First Romantic Agreement.  Furthermore, instead of making the negotiations easier in regard to the contract for the Second Romantic Project, Franklin brought in his attorney, Ronald Lebow ("Lebow"), who further complicated the negotiations.

96.  Far from acceding to the Name/Likeness Prohibition which was the entire basis of the Co-Manager's willingness to accede to the Franklin Project, Lebow added language that would have expressly permitted Romantic to use the 'name and likeness' of the Studio Group to promote the Franklin Project.  Lebow's revision of the contract contained the language, "Company shall have the right . . . to use and publish . . . Contractor's [*i.e.*, the members of the Studio Group] approved name, image and likeness."  In a July 9th, 2007 e-mail, Lebow defended this change stating, "2. Name and Likeness is standard and appropriate."  Contrary to Lebow, the entire relationship had been specifically predicated on Romantic being absolutely forbidden to use the Studio Group's name, image or likeness, a move that would certainly damage, if not destroy, their image as rock musicians.

97.  With their entire investment in the Band at risk, the Co-Managers stubbornly refused to permit Shen, the associate from Attorney Sadowsky's office handling the matter, to budge on the Name/ Likeness Prohibition.  On July 17th, Lebow sent a new version of the contract that did not expressly permit Romantic to use the Studio Group's name and likeness, but conversely did not expressly forbid it.  Although better than the prior draft, this did not provide sufficient security for Plaintiffs and the Studio Group.

p. 34

98.    On or about July 20th, 2007, for no reason apparent at the time, Geare changed his mind 180 degrees on the issue of reimbursement and conveyed his desire to Ptak to pay off the entire debt of the Band (referred to above in ¶45 as the "Purported Reimbursement").  Just two months prior, the Band was unable to purchase food and gasoline without the assistance of the Co-Managers and struggled to raise $60 to purchase a piece of software needed for their webpage.  It is, therefore, difficult to imagine where they could possibly acquire the tens of thousands of dollars needed to repay their debt to the Co-Managers apart from their ongoing relationship with Franklin/ Romantic.  Nonetheless, Geare declared that his father had decided to mortgage his house ("Geare's Father's Mortgage") to pay back his son's debt to Ptak.  On information and belief, if Geare's Father's Mortgage actually occurred and if any funds from it were included in the Purported Reimbursement, these funds were lent to Geare by his father solely as a temporary bridge loan until further funds from Franklin/ Romantic were disbursed to Geare in order to reimburse the father.  Ultimately, on information and belief, at minimum, half the source of all funds involved in the Purported Reimbursement was Franklin/ Romantic.

99.    The Purported Reimbursement took over two months to accomplish, during which time it metamorphosized into, on information and belief, a conspiracy masterminded by Sadowsky to destroy the Ptak Mgmt. Co.  Geare and Ptak initially agreed that Geare would (1) pay back the funds that Geare and the Band Members owed to the Co-Managers under the Continuing Loan; (2) both Geare and Ptak would maintain strict confidentiality during a transitional period in which; (3) Geare and Ptak would jointly locate a new west coast manager to manage the Band either exclusively or jointly with the Co-Managers.  Therefore, when the Co-Managers  initially totaled the Band's debt, they specifically anticipated that they would still be either (1) managing the Band and receiving their Management Commission (this would include twenty [20] percent of all income of the Studio Group coming from the Franklin Project, and these funds would not count as any payment whatsoever toward the Continuing Loan) or (2) the smaller Termination Commission described in ¶¶'s 25, 46 & 65; and also, (3) receiving, executive production credit on the Hong Kong Six Album as well as ownership of twenty (20) percent of the profits from the Hong

p. 35

Kong Six Album.

100.  However, by this time, Geare's strategy ("Geare's Termination Strategy") was simply to terminate the relationship with the Co-Managers completely.  Geare's Termination Strategy included denying the Co-Managers (1) any future commission on work for Franklin/ Romantic, (2) the Termination Commission, (3) the Co-Managers' share of the profits from the Hong Kong Six Album, and (4) all credit for the Co-Managers as executive producers of the Hong Kong Six Album.  In fact, Geare's Termination Strategy went further in that he intended to cease speaking to his old friend Ptak and, rather, to commence slandering Ptak's character among mutual friends and acquaintances.  On information and belief, Geare's Termination Strategy was masterminded by Sadowsky with assistance from Franklin and Afshari.

101.  Upon information and belief, Geare explained his complete breach of all his agreements with Plaintiff as being the result of Ptak desiring to be a Charlie Mansonesque cult leader; demanding that all members of the Band (1) move into a common residence, (2) give Ptak all their money, and (3) devote themselves one hundred percent to work for the Band whether or not they starved to death.  The only shadow of a factual basis to this slanderous claim is that the Band Members constantly complained to Ptak that they could not afford to pay their respective rents and were facing homelessness.  Consequently, Ptak offered to try to rent them a house and to pay the rent out of his personal funds, something a typical Band manager would not even consider.

102.  However, during the course of the negotiations leading to the Geare Settlement Geare has explained that the Geare Settlement Strategy was not his own personal strategy, but was rather dictated to him by Franklin and Sadowsky.

103. Unaware of Geare's Termination Strategy, the Co-Managers prepared an extremely conservative invoice for the Continuing Loan, in the amount of $37,093.21 (the "Reimbursement Request").  The Reimbursement Request did not even include all of the Co-Managers' direct disbursements to the Band much less (1) the cost of sourcing the funds, and (2) payment for the time and effort of the Plaintiffs.  Certainly, if the original agreement had been the

p. 36

reverse of what it actually was; if it had been a 'work-for-hire' agreement with the Band hiring Plaintiffs at a fair market rate for the Plaintiff's services instead of the other way around, Plaintiffs would have demanded an hourly professional rate of compensation. Yet such an arrangement would have been utterly unrealistic since, at the commencement of the relationship, the Defendant Musicians were penniless; and, as the Plaintiffs had achieved far more success and renown in their respective professions, they could command a far higher rate of professional compensation than could the Defendant Musicians.

104. Thus, under Geare's Termination Strategy, Geare and the Band certainly received the benefit of their bargain with Plaintiffs; they managed to acquire the services of <u>four</u> qualified professionals (1st Ptak & 2nd Kane) two highly qualified and talented creative media professionals plus (3rd Frisch) a professional high earning entertainment industry producer, and (4th Hershey) a high earning entertainment industry executive. Collectively, these contributions included traveling around the country for one and half years, paying for the Band Members personal expenses, financing the recording of an album, and giving the Band the professional outreach services that only artists signed at Major Labels ordinarily receive. In return, Geare was willing to pay back nothing more than a little more than half the money the Co-Managers had disbursed out of their personal funds. During the course of their relationship with Geare and the Band, it was certainly never Plaintiffs intention to make a gift; to the contrary, they were attempting to invest in a start up music management company and eventually a Label. Consequently, Plaintiffs certainly did not receive the benefit of their bargain.

105. Furthermore, in regard to the Purported Reimbursement, Geare did not simply write a check for the amount of the Reimbursement Request. Instead, on information and belief, Geare deceived Ptak for over a month continually claiming that the money was about to be remitted, all the while, thoroughly unbeknownst to Ptak, holding another card up his sleeve. By this time, upon information and belief, Geare was not only following the direction of Franklin and his legal staff, but also had learned that Ptak's attorney, Attorney Sadowsky, was willing to collaborate with him to defraud Plaintiffs.

p. 37

106.  Suspiciously, Geare claimed on August 9th, 2007, to have no knowledge of any further progress in dealings with Franklin/ Romantic (something he now admits to).  On August 10th, Geare declared that the money had "come through", stating further, "will have the check in full amount for you by next week."  However, on information and belief, by August 11th, desperate for Ptak to put a termination proposal on paper without an oral discussion of the terms, Geare began to reveal his hidden card.  He began to reveal his conspiracy with Attorney Sadowsky stating, "We simply don't know thing #1 about contracts. He [referring to Attorney Sadowsky] is our attorney, so we feel he really should be in charge of looking it over and breaking things down for us."

107. It is true, according to the terms of the Sadowsky Oral Retainer and the original Management Agreement referred to in ¶25, that Attorney Sadowsky was intended to serve as Geare's attorney under certain specific circumstances.  According to the Retainer's terms, Attorney Sadowsky was only  to be Geare's exclusive attorney while negotiating contracts with the outside world; *i.e.* with parties other than the Co-Managers.  Since Attorney Sadowsky was also the attorney for Ptak Mgmt. Co. (now transformed into the Ptak Label), he could only ethically serve in negotiations between Geare and the Co-Managers after full disclosure and consent, as an impartial mediator representing both sides.

108.  While Geare's August 11th e-mail was ambiguous, it was soon revealed that Attorney Sadowsky had no intention of serving as any sort of impartial mediator.  Ironically, Geare's stated concern regarding the need to use an attorney was newly found.  In contrast, during the negotiations with Franklin/ Romantic, the Studio Group had frequently circumvented the efforts of Attorney Sadowsky's office.  In response, Attorney Sadowsky had informed Ptak that he only wanted to work with the Co-Managers  rather than to be bothered with calls coming directly from the Co-Managers' artist clients.

109.   Initially, the Purported Reimbursement was simply promised to Ptak unconditionally as a way to facilitate the furtherance of the managerial relationship between the Co-Managers and the Band.  However, in an August 16th, 2007 e-mail, Geare began to indicate that

p. 38

the Purported Reimbursement was to be conditioned upon the negotiation of a termination agreement through Attorney Sadowsky.  In this e-mail, Geare claimed that Attorney Sadowsky was his attorney exclusively.

110. Unlike prior e-mails, from this moment onward, Geare's e-mails read as if written by an attorney, and a very didactic and hostile one at that.  Geare stated in part, "[T]his leads us to no option but to have Howard negotiate the terms that you want.  I'm sorry if you were under the impression that we were going to send you the check as soon we got it.  For the sake of our protection, documentation will have to be signed before the money is released to you. Howard is going to make a document that basically covers three things: 1) You are receiving $37,093.21 from the band. 2) The termination of our relationship. 3) Any terms that come with your termination."

111.  On August 22nd, Geare sent a check for the Requested Reimbursement (the "Purported Reimbursement Check").  In contrast to his prior representations, Geare apparently intended this check to be not merely a payment to open the door to good faith negotiations regarding the Termination Commission, but rather to constitute full payment for all services rendered.  Furthermore, Geare apparently intended to negotiate all future contracts without any consideration for the services rendered by Plaintiffs or Plaintiff's ownership of twenty (20) percent of the profits from the Hong Kong Six Album.  Yet Geare had never voiced any complaints whatsoever regarding the Co-Managers' services, nor any rationale as to why a partial payment should be sufficient to cover his and the Band Members' much greater debt.  As Ptak, through prior express agreement and a lengthy prior course of dealing, had always managed all of the Band's music industry income, Ptak deposited the Purported Reimbursement Check in a segregated account, where it remained escrowed until the execution of the Geare Settlement Agreement, and attempted to continue negotiations.  In recent discussions leading to the Geare Settlement Agreement, Geare has stated that the release language on the Purported Reimbursement Check was dictated word for word by Defendant Sadowsky.

112.  First Ptak inquired of Attorney Sadowsky why Geare was acting as if

p. 39

Sadowsky was his attorney exclusively rather than the attorney for the entire Ptak Mgmt. Co.,
Attorney Sadowsky answered in an e-mail dated August 22nd, 2007 that, "I will continue to
represent Hong Kong Six and its members, as well as Alex Elena, in all entertainment related
matters. As I have not represented you in any matters to date, there is no conflict of interest or
breach of ethics." In reality, Attorney Sadowsky had been Ptak's and then the Co-Managers'
attorney for over one year in regard to all entertainment-industry matters and had represented the
Co-Managers and their company in matters having nothing to do with the representation of their
musician clients. Examples include an employment agreement with ex-entertainment executive
Hershey and with the well-known soft drink manufacturer Red Bull. In fact, the Co-Managers'
relationship with Attorney Sadowsky can be described as a business partnership in addition to
being a typical Attorney – Client relationship.

   113. For example, Ptak was relying on Attorney Sadowsky to represent the Ptak
Label in negotiations with Red Bull; simultaneously, Attorney Sadowsky was relying on Ptak to
do outreach work for his own musician clients such as the highly successful band Hinder. This
multi-lateral relationship is illustrated in Attorney Sadowsky's e-mail of March 30th, 2007 where
Attorney Sadowsky, delighted at Ptak's ability to contact Red Bull at the executive level, writes
"Hey Robert, Are you around to chat this afternoon? I'd like to explore the possibilities of
strengthening Hinder's relationship with Red Bull. Best, Howard."

   114. Attorney Dan Halper ("Attorney Halper") commenced representation of Ptak
on September 7th, 2007, and promptly wrote to Attorney Sadowsky, stating that his client would
not put forth any settlement proposal until it was acknowledged that the Purported Reimbursement
Check was not a complete reimbursement of the Continuing Loan or any other obligation, and that
his client was owed residuals to be determined by industry standards. On September 13th, 2007,
Attorney Halper received an e-mail from Attorney Shen, forwarding a letter from Attorney
Sadowsky ("Sadowsky's Settlement Offer") offering Ptak an absurdly inadequate one (1) percent
residual share of potential profit from a seemingly random list of the Band's oldest material, most
of which preceded both Plaintiffs' and Attorney Sadowsky's involvement with the Band. These

p. 40

recordings had already been marketed unsuccessfully for two years, and with respect to most of them, Defendants obviously had no intention of engaging in any future marketing efforts. Even the one (1) percent offered in Sadowsky's Settlement Offer was strictly capped at $10,000 or $20,000 depending on various further limiting criteria. Attorney Halper immediately refused to even discuss this offer and warned Attorney Sadowsky that his posture was unethical and that Defendants should expect commencement of legal action.

115. Ptak received a telephone call from Geare (for the last time prior to the filing of the instant action) on September 21st, 2007. During that conversation, Geare stated that the Band was planning to get a new manager. The conversation remained amiable, and both sides promised to come to a peaceful resolution of their differences through good faith negotiations. Shortly afterward, on that day, Ptak called Elena, who admitted that the Purported Reimbursement could never have occurred without the "assistance of Franklin."

116. However, on September 25th, 2007, Ptak received a phone call from a man named Rodney Afshari ("Afshari"), purporting to be the new manager of the Band. Afshari told Ptak (1) that Ptak had no contract with the Band; (2) that Ptak would be receiving nothing further from the Band; and [bizarrely] (3) that he [Ptak] should sue the Band. On information and belief, Afshari owns a company called Inner Circle Management ("Inner Circle"). Inner Circle operates a website which now features a master recording of the Band's song "Swim With the Sharks", paid for and owned by Plaintiffs, where it is identified as being performed by "Hong Kong Six", which is now a federal registered trademark registered by Ptak. In clear violation of the Geare Settlement Agreement, to this day, no credit is given on the Inner Circle Management website to Ptak or Frisch for serving as executive producers of the Funded Sound Recordings such as Swim with the Sharks.

## AS AND FOR A FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

117. Plaintiffs repeat each and every allegation in paragraphs 1 through 116 above with the same force and effect as if fully set forth herein.

p. 41

118. The Management Agreement and the CD Ownership Agreement each constitute a valid and binding contract voluntarily and freely entered into by the Defendants.

119. The Management Agreement and the CD Ownership Agreement have been breached by, *inter alia*, the refusal of the Defendants to make any further payments to the Plaintiffs and the refusal to accept further guidance and direction or promotional activities on their behalf from the Plaintiffs, and the retaining of another manager or company in violation of the exclusive agreement to be managed by Ptak Mgmt. Co. without agreement on the Termination Commission described in ¶25.

120. Plaintiffs have been damaged by the refusals of the Defendants cited in the preceding paragraph and by the loss of future income from the anticipated continued activity as manager for the Band in the amount of not less than two hundred thousand dollars ($200,000), no part of which has been paid although duly demanded, except for the attempt cited in ¶98 above, to which unacceptable conditions were attached.

AS AND FOR A SECOND CAUSE OF ACTION

IMPOSITION OF A CONSTRUCTIVE TRUST

121. Plaintiffs repeat each and every allegation in paragraphs 1 through 20 above with the same force and effect as if fully set forth herein.

122. Defendants have continued to be active in the music industry under the name of "Hong Kong Six" and have utilized the knowledge, enhanced reputation, business contacts, physical assets, and other benefits from their association with the Plaintiffs.

123. All engagements, employment, and opportunities in the entertainment industry of the Defendants now and in the immediate future are flowing and will continue to flow directly or indirectly from the contacts made and efforts expended by the Plaintiffs during the period their Management Agreement was operative.

124. The benefits cited in the preceding paragraph were provided by Plaintiffs to the Defendants in the justifiable expectation of future profits from their contracted management commissions. By virtue of their confidential and fiduciary relationship with the Defendants, the

p. 42

Plaintiffs should be considered to have an equitable ownership interest in twenty (20) percent of the future earnings of the Defendants in the music industry.

125. Plaintiffs are entitled to the imposition of a constructive trust on twenty (20) percent of the Defendants' future earnings from performances, compositions, royalties, licensing fees, and other sources in the entertainment industry, and to an injunction against the disbursement of such amount to Defendants until the claims of the Plaintiffs expressed herein are satisfied.

AS AND FOR A THIRD CAUSE OF ACTION

BREACH OF CONTRACT

126. Plaintiffs repeat each and every allegation in paragraphs 1 through 125 above with the same force and effect as if fully set forth herein.

127. Plaintiffs have expended personal funds in the support of Defendants during the period in which the Management Agreement was operational.

128. The disbursement of all personal funds of the Plaintiffs constitutes a financial obligation which Defendants agreed to repay over and above Defendants' obligation to pay the Plaintiffs a management commission for their professional services.

129. The only reimbursement of the personal funds cited in the preceding paragraph was a partial payment to Plaintiff Ptak and placed by him into escrow.

130. The partial payment cited in the preceding paragraph was not returned on account of representations by Defendant Geare that Defendants would continue to utilize the services of Plaintiffs as their exclusive manager and remain obligated to pay Plaintiffs the percentage management commission contemplated by the Management Agreement.

131. Defendants have since repudiated the Management Agreement and thereby are obligated to reimburse Plaintiffs for the full amount of the personal funds Plaintiffs have expended on Defendants' behalf and for Defendants' expenses.

132. Plaintiffs have been damaged by the refusal of Defendants to reimburse Plaintiffs for the full amount of the personal funds Plaintiffs have expended on Defendants' behalf in the amount of not less than sixty-five thousand dollars ($65,000), no part of which has been paid

p. 43

although duly demanded, except for the attempt cited in ¶100 above, to which unacceptable conditions were attached.

## AS AND FOR A FOURTH CAUSE OF ACTION

### FRAUD IN THE INDUCEMENT

133.  Plaintiffs repeat each and every allegation in paragraphs 1 through 132 above with the same force and effect as if fully set forth herein.

134.  In June 2007, after the relationship between Plaintiffs and Defendants had been established by the Management Agreement, Defendant Geare represented to Plaintiff Ptak that he desired to be relieved of the necessity of working in non-musical jobs to support himself and offered to devote his full time and energies to the improvement and promotion of the Band if he were financially able to do so.

135. In reliance upon the representations cited in the preceding paragraph, Ptak waived immediate repayment under his Loan Priority.

136. The representations cited in the preceding paragraphs were false when made and were made for the purpose of inducing Ptak to allow money to flow from the Franklin Project to Geare which Geare then used to attempt the Purported Reimbursement which was nothing other than an attempt to cheat Ptak out of all of his rights under all of his agreements with Geare.

137.  Instead, Geare used some of his time and effort in projects, including without limitation his work for Franklin, that did not benefit the Band but rather injured its reputation.

138.  Ptak relied on Geare's representations to his detriment in continuing to send money to Geare for daily living and other expenses, none of which has been repaid. The amount of such additional disbursements to Geare and resultant damages to Ptak totals in excess of five hundred thousand dollars ($500,000).

## AS AND FOR A FIFTH CAUSE OF ACTION

### COPYRIGHT INFRINGEMENT

139. Plaintiffs repeat each and every allegation in paragraphs 1 through 139 above with the same force and effect as if fully set forth herein.

p. 44

140. Plaintiffs are the owners of all rights under the copyright laws of the United States for the songs that were composed and written by Geare under the Work-For-Hire Agreement including the lyrics, score and sound recordings.  Plaintiffs are also the owner of many other sound recordings where the Band retains ownership of the lyrics and score both under the aforementioned CD Ownership Agreement and the agency principles which control the courts interpretation of the United States Copyright Act.

141. The exclusive right to display and distribute the songs cited in the preceding paragraph to the general public are owned by the Plaintiffs.

142. On information and belief, Defendant Geare, in collaboration with the other Defendants, has displayed and distributed many of the songs for which the exclusive right to display and distribution cited in the preceding paragraph, remain with Plaintiffs, thereby infringing on the copyright interest in such songs owned by the Plaintiffs.

143. The United States Copyright Act provides for statutory damages to be paid by an infringer or joint infringers of copyright benefits to the owner of such rights, the amount of such damages to be set by a court.

144. Plaintiffs are entitled to statutory damages for each song covered by the Work-For-Hire Agreement that has been displayed or distributed by Defendants without the permission of the Plaintiffs, in the amount of not less than ten thousand dollars ($10,000) for each such song.

AS AND FOR A SIXTH CAUSE OF ACTION

TRADEMARK INFRINGEMENT

145. Plaintiffs repeat each and every allegation in paragraphs 1 through 144 above with the same force and effect as if fully set forth herein.

146. Plaintiffs have registered the name "Hong Kong Six" as a trademark for use in the United States by Plaintiffs exclusively.

147. Defendants have utilized the trade mark "Hong Kong Six" in the name of the Myspace Website (myspace.com/hongkongsix) for their musical recordings, without the permission or consent of the Plaintiffs, thereby infringing on the trademark rights of the Plaintiffs, and

p. 45

also violating the 'cybersquatting' provisions of the Lanham Act.

148. Plaintiffs are entitled to a preliminary and permanent injunction to prevent the alteration of the Myspace Website, joint control of the content of the Myspace Website, and additionally and alternatively, the recovery of the web address myspace.com/hongkongsix on account of it being entirely derivative of their Federally registered trademark, and damages in the nature of lost profits and reduced value of a registered trademark from Defendants, in an amount not less than one hundred thousand dollars ($100,000) to be determined at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### DEFAMATION OF CHARACTER

149. Plaintiffs repeat each and every allegation in paragraphs 1 through 148 above with the same force and effect as if fully set forth herein.

150. Upon information and belief, Defendants' have slandered the character of Plaintiff Ptak claiming that he is a cult figure and impossible to work with in order to make it impossible for him to execute deals in the music industry at the very moment in which he was on the edge of great success.

151. Plaintiffs have suffered loss of business reputation in the amount of not less than sixty-five thousand dollars ($65,000).

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### PROFESSIONAL MALPRACTICE

152. Plaintiffs repeat each and every allegation in paragraphs 1 through 151 above with the same force and effect as if fully set forth herein.

153. Upon information and belief, the Defendant Attorneys have breached their standard of professional care in the handling of Plaintiffs negotiations Franklin

154. Plaintiffs have suffered loss of business reputation in the amount of not less than sixty-five thousand dollars ($65,000).

## AS AND FOR A SEVENTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACT AND

TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

155.  Plaintiffs repeat each and every allegation in paragraphs 1 through 153 above with the same force and effect as if fully set forth herein.

156. Upon information and belief, the Defendant Attorneys played a major role in inducing the Defendant Musicians to breach contract with Plaintiffs.

157.  Plaintiffs have suffered loss of business in the amount of not less than one million dollars ($1,000,000).

WHEREFORE, Plaintiffs Robert Ptak, Renee Frisch, and Michael Kane, demand judgment against Defendants Robert Geare, Jeffrey Allen, Riley Geare, Carlos Rollon, and Alisa Santoro, jointly and severally, in the amount of two hundred thousand dollars ($200,000) on the first cause of action; sixty-five thousand dollars ($65,000) on the third cause of action; five hundred thousand dollars ($500,000) on the fourth cause of action; ten thousand dollars ($10,000) per song on the fifth cause of action, one hundred thousand dollars ($100,000) on the sixth cause of action, one million dollars ($1,000,000) on the seventh cause of action; and, the imposition of a constructive trust in favor of the Plaintiffs on all income derived by Defendants, or each of them, from future activities in the entertainment industry, control of the infringed web address myspace.com/hongkongsix together with the issuance of a preliminary and permanent injunction against Defendants alteration of  myspace.com/hongkongsix, and/ or disbursing any such income to Defendants, or to any of them, until the financial and equitable demands cited in the within Complaint are satisfied.

Dated:        New York, New York
              June 29, 2008

                                        _____
                                        Dan Halper, Esq.
                                        Attorney for Plaintiffs
                                        PMB 173, 249 Smith St. Brooklyn, NY 11231
                                        (347) 495-2100

# Exhibit A

# Exhibit B

# Exhibit C

# Exhibit D